UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                        :

LISA GOLDMAN,                       :

                 :

           Plaintiff,       :

                 :       04 Civ. 7890 (GEL)

   -against-              :

                 :     **OPINION AND ORDER**

ADMINISTRATION FOR CHILDREN'S   :

SERVICES and KELLIAN GOULD, in her   :

Official Capacity as Director,     :

                 :

         Defendants.    :

                 :
-------------------------------------------------------------x

Lisa Goldman, pro se.

Michael A. Cardozo, Corporation Counsel of the
City of New York (Bruce Rosenbaum and Pamela
Richardson, Of Counsel), for defendants.

GERARD E. LYNCH, District Judge:

      Plaintiff Lisa Goldman brings this action pursuant to Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e, the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et

seq. ("SHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et

seq. ("CHRL"), alleging discriminatory demotion by her employer, the Administration for

Children's Services ("ACS"), on the basis of her race, religion, and national origin.  Plaintiff also

alleges that defendants took adverse action against her in retaliation for engaging in protected

activity under Title VII, and that defendants maintained a hostile work environment.  Defendants

move for summary judgment dismissing plaintiff's claims in their entirety.  Defendants' motion

will be granted.

## BACKGROUND

The following facts are undisputed or established by undisputed documentary evidence. Additional factual contentions will be addressed in later portions of this opinion.[1]

Goldman, a white, Jewish woman, is currently employed by ACS as a Child Welfare Specialist, Level 2.  (Pl. Local Civil Rule 56.1 Statement of Undisputed Facts ¶¶ 5-6 ("Pl.

---

[1] A party moving for summary judgment in this district must submit along with its other motion papers a separate statement of numbered material facts "as to which the moving party contends there is no genuine issue to be tried."  S.D. & E.D. N.Y. R. 56.1(a) ("Rule 56.1 Statement").  The opposing party is required to submit a counterstatement responding to each numbered paragraph in the moving party's statement, and any additional paragraphs setting forth other material facts as to which the opposing party contends there is a genuine issue to be tried ("Counterstatement").  Id. at (b).  Each "statement of material fact" in both the Rule 56.1 Statement and Counterstatement "must be followed by citation to evidence which would be admissible . . . ."  Loucar v. Boston Mkt. Corp., 294 F. Supp. 2d 472, 478 (S.D.N.Y. 2003), quoting S.D. & E.D. N.Y. R. 56.1(e).

While the pro se plaintiff in this case filed a Rule 56.1 Counterstatement, most of the assertions in the Counterstatement are not followed by citations to the record.  Defendants argue that because plaintiff failed to provide citations to the record in her Counterstatement, defendants' Rule 56.1 Statement should be deemed admitted for the purposes of this motion.  However, defendants nevertheless must adduce admissible evidence in the record to support the factual assertions contained in the Rule 56.1 Statement, as plaintiff "is not required to rebut an insufficient showing."  Giannullo v. City of New York, 322 F.3d 139, 140-41 (2d Cir. 2003).  See 24/7 Records, Inc. v. Sony Music Entm't, Inc., 429 F.3d 39, 46 (2d Cir. 2005) (noting that a defendant who moves for summary judgment but fails to show an absence of evidence supporting plaintiff's claims should not receive summary judgment, even if plaintiff does not oppose the motion with any evidence).  In addition, the Court may, in its discretion, consider any facts "the parties fail to point out in their Rule 56.1 statements."  Id. (internal quotation marks and citation omitted).  See Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) ("[W]here there are no citations or where the cited materials do not support the factual assertions in the statements, the Court is free to disregard the assertion.") (emphasis added) (internal quotation marks and citation omitted).

Thus, plaintiff's failure to file a proper Counterstatement neither forecloses this Court from considering facts not presented in defendants' Rule 56.1 Statement, nor compels the Court to accept the factual assertions in defendants' Rule 56.1 Statement as true without examining the parties' supporting evidence.  As a result, the undisputed facts that are admitted for the purposes of this motion have been gleaned from an examination of the testimony and supporting  evidence presented by both plaintiff and defendants.

56.1").)[2]  Goldman was hired by ACS as a provisional Caseworker on March 10, 1997.  (Pl. 56.1 ¶ 7.)  As a Caseworker, Goldman was rated overall as "good" to "very good" for evaluation periods extending until at least March 2000.  (Def. Exs. D, E.)

In May 2002, Goldman was promoted to a position as Child Welfare Specialist Supervisor, Level I ("SUP I"), in the Office of Direct Congregate Care Services, located at 171 Market Street, Staten Island, New York ("Market Street").  (Def. Ex. F.)  Until it was closed in 2003 (see Pl. Ex. M), Market Street was a group home for female minors.  (Pl. Dep. 35; Pl. 56.1 ¶ 13.)  In August 2002, Goldman received a written memorandum outlining the responsibilities of a SUP I at Market Street and was informed that her work hours would be Sunday thru Thursday, from 3:00p.m. to 11:00p.m.  (Def. Exs. G, H; Pl. 56.1 ¶¶ 14, 15.)  Goldman's direct supervisor at Market Street was Kellian Gould.  (Compl. ¶ 12.)

Goldman began experiencing problems at Market Street almost immediately after her promotion.  On August 29, 2002, Goldman received a memo from Gould, admonishing her for

---

[2] Plaintiff did not submit any affidavits, and submitted only scant documentary evidence, in support of her factual assertions.  Instead, plaintiff mostly relies on her Rule 56.1 Counterstatement to establish the existence of disputed issues of fact.  However, although generally "allegations of uncontested fact[s] cannot be deemed true simply virtue of their assertion in a Local 56.1 statement," Holtz, 258 F.3d at 73, when a party proceeds pro se, the Court must "read [the pro se party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest."  Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).  Thus, although failure to file any supporting affidavits or sufficient evidence may result in the rejection of a party's factual assertions, plaintiff must be afforded "special solicitude" in responding to this motion for summary judgment.  Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).  The Court will therefore "overlook[] this technical default" and "consider[] [the] factual assertions made by plaintiff" in her Counterstatement as "contesting defendants' statement of material undisputed facts."  Dove v. City of New York, No. 03-CV-5052, 2007 WL 805786, at *1 n.3 (E.D.N.Y. Mar. 15, 2007).  See, e.g., Holtz, 258 F.3d at 73 ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.")

using a Market Street employee to drive her to lunch.  (Def. Ex. I.)  In September 2002, Gould instructed Goldman that one of her recently completed Uniform Case Records ("UCRs"), bi-annual updates which provide information on a specific minor's care and progress at Market Street, was incomplete and erroneous.  (Def. Ex. K.)  In October and December 2002, Goldman was informed several times that she had failed to reconcile $300 in petty cash funds that she had earlier obtained.  (Def. Exs. O-P, R-S.)

Goldman also experienced problems with a co-worker at Market Street soon after her promotion.  On September 29, 2002, Goldman sent a memo to Gould, informing her of a "serious incident" that had occurred on September 18 involving Dorothy Walker, a Child Welfare Specialist at Market Street.  (Def. Ex. T.)  Goldman claimed that, during a meeting between herself and Walker, an argument ensued and Walker called Goldman a "fucking white trash piece of shit."  (Id.)  Goldman claimed that Walker had repeatedly exhibited a "disrespectful and antagonistic attitude" towards her.  (Id.)  Walker denied making any racist comments towards Goldman, and claimed that Goldman called her a "dumb bitch."  (Def. Ex. U.)

In response to this hostility, on October 1, 2002, Gould met with both Goldman and Walker to discuss the allegations.  (Def. Ex. V; Pl. Dep. 74.)  During the conference, both parties were counseled about misconduct in the work place, and told that such statements were inappropriate.  (Def. Ex. V; Pl. Dep. 83.)  At the end of the conference, the parties agreed to try to work together.  (Def. Ex. V.)

At around the same time as that meeting, Goldman contacted ACS's Office of Equal Employment Opportunity ("OEEO") to discuss her hostile work environment allegations.  (Pl.

Dep. 73; Salley Dep. 45.)  On November 22, 2002, a mediation was held at the OEEO in

response to Goldman's complaint, which was attended by Goldman, Gould, Walker, Mary Ann

Salley, Director of the OEEO, and perhaps an additional OEEO employee.  (Salley Dep. 48-49;

Pl. 56.1 ¶ 45.)  At the mediation, both Goldman and Walker admitted that there were no

witnesses to their argument.  (Salley Dep. 49.)  Goldman and Walker were given a memo

entitled "Respectful Behavior in the Workplace."  (Id. 51, 61; Def. Ex. X.)

Goldman's employee file indicates that her difficulties at Market Street only became

worse as time went on.  In November and December, 2002, Gould sent Goldman several

memoranda, criticizing her alleged inability to manage her staff, complete accurate UCRs, and

solve problems on her own.  (Def. Exs. FF, GG, II, KK, LL.)  Also in December 2002, Goldman

was designated AWOL from work when she was accused of failing to come to work without

providing prior notice.  (Def. Ex. NN.)[3]  In February 2003, Goldman came to work on an

unscheduled day, which Gould classified as "insubordination."  (Def. Ex. TT.)  In addition, in

February 2003, Goldman was on duty during an incident in which another ACS employee,

Monique Miller, was injured by a resident of the group home.  (Def. Exs. VV, YY; Pl. 56.1 ¶¶

89-94.)  Gould criticized Goldman's handling of the matter, accusing Goldman of failing to

intervene and allowing her employee to be injured, and recommending disciplinary action for her

alleged inability to "mak[e] sound judgment[s] during a crisis."  (Def. Ex. YY.)

---

[3] Goldman asserts that she did provide prior notice of her absence.  (Pl. 56.1 ¶ 80; see Pl.
Ex. I.)  Although Goldman's absence was eventually re-designated as an authorized leave of
absence without pay (Pl. 56.1 ¶ 83; see Def. Exs. OO-RR), the parties never resolved whether
Goldman actually provided prior notice.  (See Def. QQ ("Either the date was said in error or
heard in error.")  See n.16 infra, and accompanying discussion.

The alleged problems with Goldman's job performance continued through February and March 2003, including accusations that Goldman: brought an unauthorized visitor into the facility (Def. Exs. AAA, BBB); called the police to the facility without following protocol (Def. Ex. CCC); failed to timely evaluate her subordinates (Def. Ex. DDD); failed to attend scheduled supervisory conferences (Def. Ex. EEE); and risked the safety of the facility by not providing adequate supervision (Def. Ex. FFF).

On March 15, 2003, Gould gave Goldman an "unsatisfactory" rating for the evaluation period of August 14, 2002, to November 13, 2002.  (Def. Ex. Y.)  The rating was based on several criteria, including but not limited to the following criticisms of Goldman's job performance: (1) inability to intervene in crises (Gould Dep. 77-83; Def. Exh. Z)[4]; (2) inability to properly communicate with her subordinates (Def. Ex. AA); and (3) general failure to delegate responsibility, maintain control, or run the facility in an efficient manner.  (Def. Ex. Y.)  As a result of her allegedly unsatisfactory performance, on March 20, 2003, Gould recommended that Goldman be demoted.  (Def. Ex. GGG.)  On April 29, 2003, Goldman was demoted back to her former position as Child Welfare Specialist, Level 2.  (Def. Ex. HHH.)[5]

---

[4] As a result of one such crisis, Gould sent Goldman to Therapeutic Crisis Intervention Direct Training ("TCI training").  (Gould Dep. 110-111; Pl. 56.1 ¶ 63.)  The TCI training course includes both a physical and written portion; although Goldman claims that she "fell within the norm of the class" that took the course (Pl. 56.1 ¶ 65), the course records show – and Goldman concedes – that she actually failed the course.  (Id. ¶ 66; Def. Ex. EE.)

[5] In her affidavit, plaintiff disputes all of the allegations that her work performance was deficient.  However, plaintiff does not dispute that she was repeatedly reprimanded by Gould, or that any of the aforementioned events actually occurred – she only disputes the significance of the events and the motivation for defendant's criticism.  See Section IV, infra.

On October 1, 2004, plaintiff filed the complaint that initiated the present action.  On July 28, 2006, defendants moved for summary judgment.  After many requests for extensions of time to respond, plaintiff submitted her response on March 21, 2007; the motion was fully briefed on April 11, 2007.

## DISCUSSION

### I.    Summary Judgment Standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court's responsibility is to determine if there is a genuine issue to be tried, and not to resolve disputed issues of fact.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  The Court must draw all reasonable inferences and resolve all ambiguities in the nonmoving party's favor, and construe the facts in the light most favorable to the nonmoving party.  Id. at 254-55.  However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50 (citations omitted).

The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists.  See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995).  Once the moving party has made a showing that there are no genuine issues of material fact, the burden shifts to the nonmoving party to raise triable issues of fact.  Anderson, 477 U.S. at 250.  A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the nonmoving party.  Id. at 248.

7

Rule 56 also provides that an affidavit submitted in opposition to summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).  "[P]ersonal knowledge" does not include hearsay: "[H]earsay testimony . . . that would not be admissible if testified to at the trial may not properly be set forth in [the Rule 56(e) affidavit]."  Beyah v. Coughlin, 789 F.2d 986, 989 (2d Cir. 1986) (alterations in original) (internal quotation marks and citation omitted).  In addition, "conclusory statements or mere allegations [are] . . . not sufficient to defeat a summary judgment motion."  Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002); see also id. ("The nonmoving party must go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.") (alterations in original) (internal quotation marks and citation omitted).

In employment discrimination cases, district courts must be "especially chary in handing out summary judgment . . . because in such cases the employer's intent is ordinarily at issue."  Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996).  "[E]mployers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly forbidden by law."  Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999) (internal quotation marks and citation omitted).  However, as a general rule, "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation."  Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).  Even in the employment discrimination context, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case

is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## II.    Discriminatory Demotion Claim

Plaintiff claims that defendants discriminated against her in violation of Title VII, SHRL, and CHRL.[6]  Specifically, plaintiff claims that she was demoted from her position as SUP I due to her race, religion, and national origin.  Defendants argue that plaintiff has not shown that she was treated differently from similarly situated employees outside of her protected class.  Because plaintiff has failed to provide any evidence of differential treatment, her discriminatory demotion claim will be denied.[7]

A plaintiff in a Title VII employment discrimination case bears the initial burden of "'proving by the preponderance of the evidence a prima facie case of discrimination.'"[8] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 n. 3 (1993), quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Direct evidence is not necessary, and a plaintiff charging discrimination against an

---

[6] Title VII does not provide liability against individuals.  See Tomka v. Seiler Corp., 66 F.3d 1295, 1314 (2d Cir. 1995), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998).  Accordingly, plaintiff's Title VII claims against defendant Gould must be dismissed for failure to state a claim.

[7] Although defendants assert in their answer that plaintiff's Title VII and CHRL claims are procedurally barred, they do not raise that argument in their summary judgment papers. However, even if some or all of plaintiff's Title VII or CHRL claims are procedurally barred, defendants do not argue that plaintiff's SHRL claims are procedurally barred.  Thus, because Title VII, SHRL, and CHRL are analytically identical, see n.8, a determination of the procedural viability of plaintiff's Title VII and CHRL claims is not called for at this time, as plaintiff's SHRL claims would survive regardless of whether those claims are procedurally barred.

[8] The analytical framework for evaluating plaintiff's Title VII claims applies equally to her SHRL and CHRL claims.  See Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714-15 (2d Cir. 1996); Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000).

employer is usually constrained to rely on the cumulative weight of circumstantial evidence.  See Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991) ("An employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent.").

In order to establish a prima facie case of discriminatory demotion under Title VII, the plaintiff must show that (1) she is a member of a protected class, (2) she was qualified and satisfactorily performing the duties required by her position, and (3) she was demoted from her position (4) under circumstances giving rise to an inference of discriminatory animus.  See Brierly v. Deer Park Union Free Sch. Dist., 359 F. Supp. 2d 275, 297 (E.D.N.Y. 2005), citing Walker v. Rochester Tel. Corp., No. 90-1066L, 1992 WL 518685, at *4 (W.D.N.Y. Apr. 14, 1992).[9]  Plaintiff may create an inference of discriminatory animus by either providing direct evidence of discrimination or showing that "she was treated less favorably than" similarly situated employees "in circumstances from which a [discriminatory] motive could be inferred." Montana v. First Fed. Sav. & Loan Ass'n of Rochester, 869 F.2d 100, 106 (2d Cir. 1989). Although the burden of production then shifts to the defendant to articulate a nondiscriminatory reason for the challenged employment decisions, see Burdine, 450 U.S. at 254, once the defendant proffers a legitimate motive, the presumption of discrimination triggered by the prima facie case no longer operates.  See St. Mary's, 509 U.S. at 507.  At that point, the plaintiff has

---

[9] Defendants argue that plaintiff's various other allegations of discriminatory conduct, including Gould's constant criticism of her job performance and restriction of plaintiff's access to Gould's private bathroom, can not constitute a violation of Title VII because they do not rise to the level of "adverse action" required for a claim of discrimination.  (Def. Mem. 9.)  However, plaintiff's complaint specifically states that she is claiming only discriminatory demotion (Compl. ¶¶ 46-54); thus, it is unnecessary to determine whether any of defendants' other alleged discriminatory conduct constitutes "adverse action" under Title VII.

the opportunity to demonstrate that defendant's articulated reason for its decision is in fact a pretext for discrimination and retains the ultimate burden of persuasion to demonstrate by a preponderance of the evidence that the challenged employment decision was the result of intentional discrimination.  See id. at 507-08.

Defendants argue that plaintiff has failed to satisfy two prongs of the prima facie test for discriminatory demotion.[10]  Specifically, defendants argue that plaintiff was not satisfactorily performing the duties of her job, and that plaintiff has not provided sufficient evidence creating an inference of discrimination.  Plaintiff argues that defendants' evidence of her poor work performance is merely a pretext, the purpose of which is to cover up for defendants' discriminatory animus, and that she was treated differently from similarly situated employees outside of her protected class.

Generally, analysis of a discrimination claim begins with an inquiry into whether plaintiff has shown a prima facie case, and only if plaintiff makes such a showing should the Court determine whether defendants' preferred reasons for its adverse actions were genuine or merely

---

[10] Defendants also dispute that plaintiff has satisfied the first prong of the prima facie test with respect to her claim of discrimination on the basis of national origin.  Defendants argue that plaintiff's national origin discrimination claim is based on her contention that she was treated differently from other employees because she is "non-Carribean," and thus her claim is not cognizable because "non-Carribean" is not a national origin.  See Thompson v. City of New York, No. 98 Civ. 4725, 2002 WL 31760219, at *5 n.5 (S.D.N.Y. Dec. 9, 2002) ("As neither 'the Islands' nor 'the Carribean' are countries, plaintiff has not demonstrated that she is a member of a protected class . . . .").  However, defendants mischaracterize plaintiff's national origin claim. Plaintiff's national origin claim is based on her status as an American, not as "non-Carribean" (see Pl. 56.1 ¶ 6 (claiming a national origin of "United States")), and "American" is a protected status.  See, e.g., Barnett v. Tech. Int'l, Inc., 1 F. Supp. 2d 572, 577 (E.D. Va. 1998) (considering claim of discrimination based on American national origin); Papaila v. Uniden Amer. Corp., 840 F. Supp. 440, 446 (N.D. Tex. 1994) (same).  Accordingly, plaintiff's national origin claim does not fail on that basis.

a pretext for discrimination.  Yet, the issues surrounding the prima facie inquiry and those surrounding the pretext inquiry are not easily distinguishable, despite the apparent rigidity of the burden-shifting formula.  Instead, the bottom line in a Title VII summary judgment motion is, simply, whether plaintiff has presented sufficient evidence from which a reasonable trier of fact could determine that defendants discriminated against her.

Judged from that standard, plaintiff's discrimination claim in this case is not simply weak – it is nonexistent.  Plaintiff has provided no evidence, other than her own speculation and conjecture, that her demotion was the result of a discriminatory animus.  Defendants' record of Goldman's alleged insufficient work performance is extensive, ranging from memos from Gould to Goldman about issues as disparate as resident safety to laundry room management, dated as early as August 2002 (Def. Exs. G-K, P, R-S, BB, FF, GG, II, KK-MM, SS-UU, YY-ZZ), to letters from Goldman's subordinates to Gould concerning Goldman's poor supervisory skills (Def. Ex. AA), to the results of a performance-related examination that Goldman failed (Def. Ex. EE), all culminating in a review recommending demotion (Def. Ex. Y).

Moreover, defendants' evidence casts a much wider net than just Gould's criticism of Goldman's job performance.  See Hill, 467 F. Supp. 2d at 365 (noting that defendants had presented third-party evidence of plaintiff's poor work performance).  Goldman's job performance also was criticized by her subordinates in a series of letters to Gould (Def. Ex. AA), as well as by a resident of Market Street (Def. Ex. XX).  Defendants also present the testimony of Goldman's subordinates, in which they recount instances when Goldman failed to adequately supervise or manage the Market Street facility (Walker Dep. 35, 59-60; Miller Dep. 36, 97); one such instance resulted in a serious injury to one of Goldman's employees.  (Miller Dep. 58-66;

see Def. Ex. VV.)  In addition, Goldman's ability to deal with crises – an important aspect of her job – was measured by an objective examination, which Goldman failed.  (Def. Ex. EE; Pl. 56.1 ¶ 65.)

Conversely, plaintiff's evidence of pretext consists mostly of her own self-serving statements that her demotion was not justified because: she was inadequately trained (Pl. 56.1 ¶¶ 32, 56, 61, 63, 68); Gould "thrived in chaos" (id. ¶ 20) which made it impossible for plaintiff to adequately perform her job; and plaintiff's job performance did not fall below ACS's standards because ACS was "historically and routinely" mismanaged (id. ¶¶ 22, 58; see Pl. Ex. E).  Although reasonable persons may differ as to whether defendants' criticism of plaintiff's work performance was justified, the responsibility of the Court is not to judge the reasonableness of employment decisions, but only to determine whether the employment decision was motivated by a discriminatory animus.  See Buompane v. Citibank, N.A., No. 00 Civ. 7998, 2002 WL 603036, at *14 (S.D.N.Y. Apr. 18, 200) ("[A] court may not 'act as a super personnel department that second guesses employers' business judgments,' so long as those judgments . . . are not made with discriminatory intent."), citing Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001).  Absent evidence that the criticism was actually motivated by a discriminatory animus, plaintiff's discrimination claim must fail.

Plaintiff provides no evidence of defendants' alleged discriminatory animus other than her own speculation and conjecture.  (See Pl. Dep. 167 ("I think [Gould] probably favored her particular origin."); id. 175 ("I don't believe so . . . I don't think so."); id. 177 ("I didn't know it for a fact, but I believe it is possible."); id. 178 ("I don't know for a fact.").)  Although the Court is mindful that employment discrimination can be especially difficult to prove "since an

employer who discriminates against its employee is unlikely to leave a well-marked trail,"
Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000), a plaintiff in an employment
discrimination case cannot satisfy her burden through speculation and conjecture.  See Schwapp
v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) ("[A] plaintiff must provide more than
conclusory allegations of discrimination to defeat a motion for summary judgment.").  Instead,
she must provide "depositions, affidavits, and [other] materials" that support her claim.
Chertkova, 92 F.3d at 87.  But plaintiff provides no such evidence; her support consists entirely
of her own statement and a few documents that are irrelevant to her discrimination claim.  (See,
e.g., Pl. Ex. D (attaching a newspaper article about ACS's alleged mismanagement).)  See
Graham, 230 F.3d at 41 (rejecting plaintiff's discrimination claim because it was based on
plaintiff's "bare assertion" without any supporting evidence).

　　　　Moreover, even if defendants' criticism of plaintiff's work performance was overly
harsh, unjustified, or petty, plaintiff has provided no evidence that any non-Jewish, non-white, or
non-American employees who were similarly situated to her were treated any better.  In order to
raise an inference of discrimination, plaintiff must show that she was "similarly situated in all
material respects" to an individual "outside [her] protected group" who was treated preferentially
to her.  Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).  Whether an employee is
similarly situated to plaintiff "must be judged based on (1) whether the plaintiff and those [she]
maintains were similarly situated were subject to the same workplace standards and (2) whether
the conduct for which the employer imposed discipline was of comparable seriousness."  Id. at
40, citing Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 96 (2d Cir. 1999).  Although the
question of whether two employees are similarly situated "ordinarily presents a question of fact

14

for the jury," id. at 39, a Title VII plaintiff must nevertheless present at least *some* evidence by which a reasonable factfinder could determine that she was similarly situated to other employees outside of her protected class who were treated preferentially to her.

First, with respect to her claim of discrimination based on religion, plaintiff fails to identify, and the record does not otherwise indicate, the religion of any other employee except for Gould, who, like plaintiff, is Jewish.  (Pl. Dep. 188.)[11]  Thus, plaintiff's claim of discrimination based on religion must fail, as she has not identified any individuals "outside" of the "protected group" to whom she may compare herself, and has provided no direct evidence of discrimination based on religion.[12]

Second, with respect to her race and national origin discrimination claims, plaintiff has not identified any similarly situated non-white, non-American employees who were treated preferentially to her.  Plaintiff argues that she was generally treated less favorably than other employees who came from Gould's "neck of the woods."  (Pl. Dep. 167.)  However, plaintiff does not specifically identify the national origin or race of many of those employees (see Pl.

---

[11] Although plaintiff "highly doubts" that Gould is actually Jewish, she provides no basis for her disbelief, except her assertion that she did not observe Gould exhibit Jewish "tendencies" or "regulations."  (Pl. Dep. 188.)  Needless to say, plaintiff's entirely subjective evaluation of Gould's religious observance does not constitute evidence.  It is also contradicted by aspects of plaintiff's own testimony.  See n.12 infra.

[12] Plaintiff argues that Gould discriminated against her by asking her if she would like to "come to [Gould's] Friday night group" in observance of the Jewish Sabbath.  (Pl. Dep. 189.) An invitation to attend a religious event by a co-worker of the same faith neither constitutes discrimination on the basis of religion, which must by definition include an adverse action, see Weeks v. New York State (Div. of Parole), 273 F.3d 76, 85 (2d Cir. 2001), nor provides evidence of discriminatory animus – indeed, it strains credulity to interpret such an invitation, which plaintiff does not claim was insincere, as motivated by a discriminatory animus, no matter how uncomfortable it might have made her.  See Section III, infra.

Dep. 177 ("I believe she may be Caribbean."); id. 179 ("[S]he could be Jamaican.")), nor does

she specifically identify the national origin or race of Gould.  (Pl. Dep. 167 ("I can't tell you

which [Caribbean] island [Gould is from]."); id. (speculating that Gould was "black" on account

of her "appearance" as such).)  Such "sweeping allegations," in which plaintiff cannot even

identify, and presents no evidence of, the race or national origin of alleged comparators, can not

satisfy the similarly situated test.  Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 65 (2d Cir.

1997); see id. (assertion that plaintiff was similarly situated to male employees without more

specific, substantiated evidence, deemed insufficient to satisfy plaintiff's prima facie burden).

Instead, plaintiff is required to provide "an objectively identifiable basis for comparability"

between herself and other employees.  Avillan v. Potter, No. 04 Civ. 9019, 2006 WL 3103309, at

*11 (S.D.N.Y. Nov. 1, 2006), citing Graham, 230 F.3d at 40.  Plaintiff's "[c]onclusory

assertions," which "fail to furnish any objective basis for comparing the treatment plaintiff

received to more favorable treatment received by" non-white, non-American employees, are

insufficient to establish that employees from Gould's "neck of the woods" were similarly

situated to her.  Avilan, 2006 WL 3103309, at *12.

     Goldman provides no evidence that other supervisors who were not white, Jewish, or of

American origin were judged by different standards, or treated less harshly for similar

infractions, than she was.  The only specific employees plaintiff points to as comparators are

Walker and Jennifer Edwards, both Child Welfare Specialists.  (Pl. Dep. 176-77 ("Ms. Walker

got . . . preferential treatment across the board on lots of things."); id. 179-80 (alleging that

Walker and Edwards had computer access but plaintiff did not).)  Even disregarding the fact that

plaintiff has not established the national origin or race of Walker or Edwards (see id. 177), as

plaintiff's "subordinate[s]" who held different job functions from plaintiff (id. 79), Walker and Edwards were not similarly situated to plaintiff "in all material respects" because they were not subject to "the same workplace standards."  (See, e.g., Pl. 56.1 ¶ 23 (conceding that Walker, unlike plaintiff, participated in certain financial administration activities at Market Street).)  See Graham, 230 F.3d at 39 (in order to satisfy the similarly situated test, plaintiff must show "that her co-employees were subject to the same performance evaluation and discipline standards"). See, e.g., Gambrell v. Nat. R.R. Passenger Corp., 2003 WL 282182, at *7 n.12 (S.D.N.Y. Feb. 3, 2003) (whether co-employees "answered to the same supervisor" is an "important factor" to consider in determining whether the co-employees were subject to the "same workplace standards"), citing Ramos v. Marriot Int'l Inc., 134 F. Supp. 2d 328, 340 (S.D.N.Y. 2001).  See also Shumway, 118 F.3d at 64 (rejecting Title VII claim where alleged comparators "had different supervisors"); Hayes v. Kerik, 414 F. Supp. 2d 193, 204-05 (E.D.N.Y. 2006) (plaintiff correction officer was not similarly situated to other employees with whom she sought to compare herself because she was a "captain" and the other employees "were of varying ranks"); White v. Fuji Photo USA, Inc., 434 F. Supp. 2d 144, 154 (S.D.N.Y. 2006) (plaintiff's alleged comparators were not similarly situated because they held different job functions from plaintiff).

Moreover, plaintiff fails to adduce any evidence that any employees outside of her protected class engaged in conduct that was similar to plaintiff's, for which the other employees received different or lesser "discipline."  For example, plaintiff argues that an inference of discrimination arises from the fact that Gould required her shift to confiscate residents' cell phones, but did not require other shifts to do so (Pl. Dep. 184), and that other shifts were given information that her shift was not given.  (Id. 182.)  Assuming arguendo that differential

treatment of plaintiff's shift from other shifts constitutes "discipline" under Title VII, plaintiff concedes that members of other shifts included both white and American employees.  (Id. 186.) Since they were also members of the same "protected class" as plaintiff, any differential treatment based on shifts does not suggest discrimination.

In addition, plaintiff claims that Walker was given a key to Gould's office and thus allowed to use Gould's private bathroom while plaintiff was not.  (Id. 80, 175.)  Not being allowed to use a supervisor's private bathroom is hardly an adverse employment action.  In any event, Goldman concedes that Walker's job responsibilities, unlike plaintiff's, required her to have a key to Gould's office.  (Id. 80 (conceding that Walker had access to Gould's office because "[t]he Sub Imprest funds" were located there, and that no one other than Walker had keys to Gould's office); see also Walker Dep. 29, 95.)  Finally, plaintiff argues that her placement on AWOL status in December 2002 was motivated by a discriminatory animus.  (Pl. Compl.¶¶ 17-19.)  But, once again, plaintiff has provided no evidence that other, non-white, non-American employees were treated differently when they were absent from work for a prolonged period, allegedly without an apparent excuse, and she has provided no evidence that the decision to place her on AWOL status was motivated by a discriminatory animus.

Thus, plaintiff fails to point to any non-Jewish, non-white, or non-American *supervisors* who engaged in similar conduct and who were treated preferentially to her.  As a supervisor, plaintiff had different responsibilities from those of caseworkers or other employees. Defendants' purported reasons for demoting her go essentially to her performance of supervisor responsibilities.  This case might look different if plaintiff were the only Jewish, American, and/or white supervisor, and defendants nit-picked her performance while tolerating sloppy

behavior by other supervisors.  But plaintiff offers nothing to suggest this.  Indeed, plaintiff

offers no account of how other supervisors were managed, or who they were in terms of race,

national origin, or religion.

It is possible that defendants placed unreasonable job demands on plaintiff, resulting in

her demotion.  But Title VII does not protect against poor professional judgment, nepotism, or

differential treatment due to personal distaste, jealousy, or any multitude of subjective factors;

Title VII only protects against *discriminatory* treatment.  Plaintiff has failed to show that a

reasonable trier of fact could find that her demotion was motivated by a discriminatory animus.

Accordingly, defendants' motion for summary judgment with respect to plaintiff's claim of

discriminatory demotion is granted.

## III.   Hostile Work Environment Claim

Plaintiff also claims that defendants maintained a hostile work environment in violation

of Title VII.  Defendants argue that plaintiff has not set forth sufficient examples of religious-

based, race-based, or national origin-based animus to create a hostile work environment, or

alternatively, that any alleged hostility could not be imputed to ACS.  The Court agrees.

"Title VII affords employees the right to work in an environment free from

discriminatory intimidation, ridicule, and insult."  Meritor Savings Bank, FSB v. Vinson, 477

U.S. 57, 65 (1986).  To prevail on a hostile work environment claim, a plaintiff must

demonstrate: "(1) that her workplace was permeated with discriminatory intimidation that was

sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a

specific basis exists for imputing the conduct that created the hostile environment to the

employer."  Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996) (internal

19

quotation marks and citation omitted).  The conduct alleged must be severe and pervasive

enough to create an environment that "would reasonably be perceived, and is perceived, as

hostile or abusive."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993); see Doe v. R.R.

Donnelley & Sons Co., 42 F.3d 439, 444 (7th Cir. 1994) ("[T]he conduct in question is to be

judged by both an objective and a subjective standard.").

 "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at

all the circumstances."  Harris, 510 U.S. at 23.  As the Supreme Court has stated, "'mere

utterance of an . . . epithet which engenders offensive feelings in an employee' does not

sufficiently affect the conditions of employment to implicate Title VII."  Id. at 21, quoting

Meritor, 477 U.S. at 67.  For comments, slurs, and jokes to constitute a hostile work

environment, there must be "more than a few isolated incidents of racial enmity," Snell v.

Suffolk County, 782 F.2d 1094, 1103 (2d Cir. 1986), meaning that "[i]nstead of sporadic . . .

slurs, there must be a steady barrage of opprobrious [discriminatory] comments."  Schwapp, 118

F.3d at 110, quoting Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994).  Thus, "whether

[religious or] racial slurs constitute a hostile work environment typically depends upon 'the

quantity, frequency, and severity' of those slurs," Schwapp, 118 F.3d at 110-11, citing Vore v.

Ind. Bell Tel. Co., 32 F.3d 1161, 1164 (7th Cir. 1994), considered "cumulatively in order to

obtain a realistic view of the work environment."  Doe, 42 F.3d at 444; see Harris, 510 U.S. at

23.  See also DelaPaz v. N.Y. City Police Dep't, No. 01 Civ. 5416, 2003 WL 21878780, at *3

(S.D.N.Y. Aug. 30, 2003) ("[T]he Second Circuit erected a remarkably high hurdle with respect

to the level and frequency of offensive conduct that must be present in order to sustain . . . a

[hostile environment] claim.").

Plaintiff claims that defendants maintained a work environment that was hostile to her on the basis of her religion and race.[13]  However, she has not proferred any instance of religious hostility in the workplace.  According to plaintiff's own testimony, her faith was discussed only twice during her entire tenure at Market Street; first, when Gould asked plaintiff if she was Jewish and told her that she (Gould) was Jewish as well (Pl. Dep. 188), and second, when Gould invited plaintiff to attend a Friday night worship group.  (Id. 189.)  Not only were these comments not "sufficiently severe" to create a hostile work environment, but they were not even *hostile* – indeed, they are more accurately classified as *friendly*, even if they made plaintiff uncomfortable.  (See id. ("I really don't feel is would be proper to get involved with my supervisor on that level . . . .").)

A pattern of insistence by a supervisor on participation in religious activity could create an atmosphere of religious intolerance.  See, e.g., Young v. Southwestern Savings and Loan Ass'n, 509 F.2d 140, 144 (5th Cir. 1975) (insistence that employees participate in staff meetings that included "religious exercises" constituted religious harassment); Mun v. Univ. of Alaska at Anchorage, 378 F. Supp. 2d 1149, 1160 (D. Alaska 2005) (insistence that employees participate in prayer groups constituted religious harassment).  But a single invitation, never repeated after rejection, is nothing like the facts of such cases, in which the pervasive, continuous nature of the supervisor's insistence caused the employees "considerable emotional discomfort."  Young, 409 F.2d at 144.  Plaintiff does not argue that Gould's comments were insincere, mocking,

---

[13] Although plaintiff also alleges that defendants maintained a hostile work environment based on her national origin (Compl. ¶¶ 30, 35, 41), the record is entirely devoid of any allegations that plaintiff's co-workers were hostile to her because of her national origin.

intimidating, or were objectively offensive.  Therefore, plaintiff's claim of hostile work environment based on religious animus fails.

Plaintiff's hostile work environment claim based on racial animus also relies on a single incident, the argument during which Walker allegedly called Goldman a "white trash piece of shit."  (Pl. 56.1 ¶ 38.)  However, even if true, one incident of hostility standing alone rarely suffices to create a hostile work environment unless it is "sufficiently . . . abusive," Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 437 (2d Cir. 1999), abrogated on other grounds by Burlington Northern and Santa Fe Ry. Co. v. White, 126 S. Ct. 2405 (2006) – for example, when an employee has been sexually assaulted.  See Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995) (one instance of sexual assault sufficient to constitute hostile work environment), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998).  Clearly, one slur, in the context of a larger argument, made by a subordinate towards her supervisor after which the supervisor ordered the subordinate to leave her office and the subordinate complied (Def. Ex. U), is not analogous to a sexual assault, but instead is properly characterized as an "isolated, minor episode[]" that did not create a hostile work environment.  Torres v. Pisano, 116 F.3d 625, 631 (2d Cir. 1997).  See Tomka, 66 F.3d at 1306 n.5 ("[I]solated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive.").

Moreover, even if Walker's comment, standing alone, were "sufficiently severe" to create a hostile work environment, Walker's conduct cannot be imputed to defendants because defendants took appropriate remedial action in response.  See Torres, 116 F.3d at 638

22

("[Defendant] can be held liable only if [it] did not fulfill [its] duty to take reasonable steps to remedy the harassment.")  Although plaintiff argues that defendants' remedial actions were insufficient (Pl. 56.1 ¶¶ 42-47), she provides no evidence of the insufficiency of the remedial actions besides her own conclusory assertions, and her argument is belied by the extensive record provided by defendants.  Goldman informed Gould about the incident with Walker on September 29, 2002.  (Def. Ex. T.)  On October 1, 2002, Gould called both Walker and Goldman into her office to discuss the allegations.  (Def. Ex. V; Pl. Dep. 74.)  Both Walker and Goldman were told that the statements each had allegedly made were inappropriate.  (Def. Ex. V.)  Gould counseled both Goldman and Walker about misconduct in the workplace and aided them in resolving their differences.  (Id.; Pl. Dep. 83.)  Gould also informed the OEEO Director about the incident.  (Def. Ex. V.)  In addition, on November 22, 2002, in response to plaintiff's OEEO complaint about the incident, a mediation was held at the OEEO.  (Salley Dep. 48-49; Pl. 56.1 ¶ 45.)  During the mediation, the OEEO Director told both Walker and Goldman that "if [you] did not make the alleged comments, fine.  If [you] did, [you are] not to do it again."  (Salley Dep. 48-49.)  Both Goldman and Walker were provided with a copy of a memorandum entitled "Respectful Behavior in the Workplace."  (Id. 51, 61; Pl. 56.1 ¶ 47; Def. Ex. X.)  Since there were no witnesses to the altercation, and Goldman and Walker gave differing accounts of what occurred, it is difficult to see how a reasonable employer could have done more.  As defendants provided plaintiff with a "reasonable avenue for [her] complaint," Richardson, 180 F.3d at 441 (internal quotation marks and citation omitted), "plaintiff cannot impute the hostile environment" created by Walker's alleged comment to defendants.  DelaPaz, 2003 WL 21878780, at *3.

Accordingly, defendants' motion for summary judgment with respect to plaintiff's hostile work environment claim is granted.

## IV.    Retaliation Claim

Plaintiff also claims that defendants took adverse action against her in retaliation for engaging in protected activity under Title VII.  Title VII provides that it "shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [such employee] has opposed any practice made an unlawful practice by this subchapter."  42 U.S.C. § 2000e-3(a).  Plaintiff contends that defendants violated this provision by demoting her in retaliation for her complaints about the alleged hostile work environment at Market Street.

Retaliation claims are evaluated under the burden shifting rules established by the Supreme Court in McDonnell Douglas, 411 U.S. 792.  See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 764 (2d Cir. 1998).  "In the context of a motion for summary judgment, the plaintiff must first demonstrate a prima facie case of retaliation."  Richardson, 180 F.3d at 443. To establish a prima facie case of retaliation a plaintiff must show (1) participation in a protected activity that is known to the defendant, (2) an employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse decision. Van Zant, 80 F.3d at 713.  Plaintiff may show a causal connection either (1) "*indirectly*," by presenting evidence of temporal proximity between the protected activity and adverse action, or through other evidence such as different treatment of similarly situated employees, or (2) "*directly*, through evidence of retaliatory animus directed against . . . plaintiff by the defendant." DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987) (emphasis in original).

24

If plaintiff demonstrates a prima facie retaliation case, the burden shifts to defendant to "point[] to evidence that there was a legitimate, nonretaliatory reason for the complained of action." Richardson, 180 F.3d at 443.  If the defendant meets its burden, the plaintiff must demonstrate that "there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." Gallagher v. Delaney, 139 F.3d 338, 349 (2d Cir. 1998), abrogated on other grounds by Ellerth, 524 U.S. 742.

There is no dispute that plaintiff engaged in protected activity when she complained to defendants about the alleged hostile work environment created by Walker's comment.[14]  See id. There is also no dispute that plaintiff was demoted after she filed her complaint, which "disadvantaged" plaintiff during the course of her employment.[15]  Rather, the dispute centers on

---

[14] Although, as discussed above, plaintiff fails to demonstrate a prima facie case for hostile work environment, "[i]t is not necessary for claims to be successful to be protected." Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 362 (S.D.N.Y. 2006), citing Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 2001).  Instead, plaintiff "need only have a good faith, reasonable belief that" Title VII has been violated to demonstrate a prima facie retaliation case. Id.  Defendants do not argue that plaintiff lacked such a "good faith, reasonable belief."

[15] Defendants also argue that plaintiff cannot satisfy the second prong of the retaliation test because the adverse actions she complains of, with the exception of the demotion, "do not amount to . . . adverse employment action[s]" under Title VII.  (Def. Mem. 22.)  Defendants argue that the other actions of which plaintiff complains, such as Gould's repeated criticisms of her job performance, the placement of plaintiff on the AWOL list in December 2002, and the failure of Gould to allow plaintiff to use her private bathroom, do not constitute "materially adverse actions" because they would not have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  (Id., citing White, 126 S. Ct. at 2415.)  As an initial matter, it is unclear whether plaintiff's retaliation claim should be read to assert any adverse action besides her demotion.  (Compare Compl. ¶ 58 (after plaintiff complained about Walker's comment, she "was subjected to a work environment that became even more hostile"), with id. ¶ 59 ("[I]n response to her complaints of discrimination, the Defendant demoted [plaintiff] from the position of supervisor.").)  However, to the extent that the complaint should be read to allege other adverse, retaliatory actions besides the demotion, those actions do not constitute retaliation for the same reason that plaintiff's demotion does not constitute retaliation, i.e., plaintiff cannot show that any of those actions were the result of a retaliatory animus, as discussed below.

(1) whether plaintiff has established a causal connection between the protected activity and her

demotion, and (2) whether defendants had legitimate, non-retaliatory reasons for the demotion.

Because plaintiff does not present direct evidence of retaliation, she must rely on

"indirect evidence, namely, the proximity between [her] protected activity and the alleged

adverse action[] brought against her" to establish a causal connection.  Hill v. Rayboy-

Brauestein, 467 F. Supp. 2d 336, 364 (S.D.N.Y. 2006).  Defendants argue that the seven-month

span between plaintiff's protected activity and her demotion negates the causal connection.

However, there is no bright line in determining sufficient temporal proximity between protected

activity and adverse action in a retaliation claim.  See Cioffi v. Averill Park Cent. Sch. Dist. Bd.

of Ed., 444 F.3d 158, 168 (2d Cir. 2006) ("No bright line . . . define[s] the outer limits beyond

which a temporal relationship is too attenuated to establish a causal relationship between the

exercise of a federal constitutional right and an allegedly retaliatory action.") (alterations in

original) (internal quotation marks and citation omitted).  Comparable, and even longer, time

lags between protected activity and adverse action have been held to permit an inference of

retaliation.  See Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d

545, 555 (2d Cir. 2001) (passage of up to five months short enough for causal connection);

Richardson, 180 F.3d at 446-47 (acts within one month of receipt of deposition notices may be

retaliation for initiation of lawsuit more than one year earlier); Bernhardt v. Interbank of N.Y.,

18 F. Supp. 2d 218, 226 (E.D.N.Y. 1998) (characterizing the question of whether a causal

connection was established by an eleven-month span between protected activity and adverse

action as "a question of fact, beyond the authority of the Court to resolve").  Moreover, plaintiff

can be taken as arguing that various incidents during the seven-month span between her

26

September 29 complaint and April 29 demotion were part of a course of conduct leading to her demotion, and some of those incidents occurred closer in time to her complaint.  It cannot therefore be said that a reasonable factfinder would be required to find the complaint too remote in time from the demotion to permit an inference of retaliation.  Thus, plaintiff has satisfied the prima facie test for retaliation.

However, as discussed above, defendants offer legitimate, non-retaliatory reasons for plaintiff's demotion, and plaintiff offers no evidence that defendants' reasons were pretextual to an unlawful animus, be it discriminatory or retaliatory.  See Section II, supra.  For example, plaintiff's assertion that defendants' criticism of her job performance was a cover for Gould's poor supervisory skills and ACS's mismanagement is irrelevant to the determination of whether plaintiff's demotion constituted retaliation; instead, the relevant inquiry is whether the demotion was motivated by a retaliatory animus.  See Alston v. N.Y. City Trans. Auth., No. 02 Civ. 2400, 2003 WL 22871917, at *9 (S.D.N.Y. Dec. 3, 2003) (rejecting retaliation claim where plaintiff provided evidence of defendants' financial mismanagement, but no evidence of retaliatory animus).

Plaintiff's assertion that Gould's criticism of her job performance is a fabrication intended to cover up for her retaliatory animus (see, e.g., Pl. 56.1 ¶¶ 85, 97, 101), consists merely of her own conclusory assertions that Gould had lied (see Pl. 56.1 ¶ 58 ("It is a lie."); id. ¶ 78 ("[T]hat is an untruth."); id. ¶ 81 ("Ms. Gould should never have contacted [ACS's Employee Relations Manager] to lie about my being absent without authorization.")), which is insufficient to create an inference of retaliatory animus.  See Holt v. KMI-Continental, Inc., 95 F.3d 123, 130 (2d Cir. 1996) (pretext cannot be established by plaintiff's "personal belief," especially where

27

"the facts . . . indicate" that defendant was not motivated by an unlawful animus).  As discussed above, plaintiff has the burden to produce evidence and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible."  Hawana, 230 F. Supp. 2d at 524.

Finally, Gould's criticism of plaintiff's job performance began in August 2002 (Def. Exs. G-K), before plaintiff complained about the alleged hostile work environment in October 2002, which militates against any inference that Gould's criticism was related to plaintiff's complaint. Given this extensive record of legitimate, non-retaliatory reasons for plaintiff's demotion, which plaintiff does not adequately refute with admissible evidence, a reasonable trier of fact could not find that her demotion was the product of a retaliatory animus.[16]

The record thus establishes that defendants had a legitimate, non-retaliatory reason for demoting plaintiff – her work performance was deficient.  "Absent any affirmative evidence that plaintiff's [demotion] was motivated by a retaliatory animus, plaintiff is left with a weak

---

[16] One additional example of defendants' allegedly retaliatory conduct deserves somewhat more elaboration because defendants do not fully explain the circumstances surrounding it.  On December 31, 2002, plaintiff was designated AWOL when she stopped showing up for work for five consecutive days without contacting Gould, in violation of ACS procedures.  (Def. Ex. MM.)  Plaintiff claims that she notified Gould prior to her absence that she would be out of the office due to a medical procedure, and she claims Gould ignored the prior notification in retaliation for plaintiff's hostile work environment complaint and informed ACS about the unauthorized absence, thereby putting plaintiff "in jeopardy of being terminated." (Pl. 56.1 ¶ 80; see id. ¶ 81; Pl. Ex. I.)  However, instead of providing any evidence that Gould's alleged failure to recall plaintiff's prior notification was intentional or malicious, plaintiff acknowledges that Gould's alleged failure to recall plaintiff's prior notification may have been the result of negligence and not an intentional attempt to retaliate against her.  (Pl. 56.1 ¶ 81 ("[Gould] has a history of being difficult to contact.").)  Finally, plaintiff does not dispute that her absence was eventually re-designated as an authorized leave of absence, and so no adverse action was taken against her as a result.  (Def. Exs. OO-RR.)  Thus, plaintiff has not presented sufficient evidence by which a reasonable trier of fact could determine that plaintiff's AWOL designation was motivated by a retaliatory animus.

inference arising from the not particularly close temporal proximity between her protest and her [demotion], which is insufficient to raise a jury question of pretext." Koumantaros v. City Univ. of N.Y., No. 03 Civ. 10170, 2007 WL 840115, at *13 (S.D.N.Y. Mar. 19, 2007). See Wang v. State Univ. of N.Y. Health Sciences Ctr. at Stony Brook, No. 02 Civ. 5840, 2006 WL 3939550, at *6 (E.D.N.Y. Feb. 23, 2006) (granting defendant's motion for summary judgment on plaintiff's retaliation claim because, "[s]imply put, Plaintiff has not provided any evidence from which a juror or this Court can infer that Defendants' proffered reasons for [the adverse action] were pre-textual to Defendants' alleged retaliatory animus"). "The critical question is whether a plaintiff has proven by a preponderance of the evidence that the defendant . . . retaliated against [her] for engaging in protected activity." Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993) (internal quotation marks and citation omitted). Plaintiff has not done so.

Accordingly, defendants' motion for summary judgment with respect to plaintiff's retaliation claim is granted.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted.

SO ORDERED.

Dated: New York, New York
         May 28, 2007

GERARD E. LYNCH
United States District Judge

29